595 F.2d 1086
 UNITED STATES of America, Plaintiff-Appellee,
v.
David Floyd CAPO, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
David Lee LUKEFAHR, Stephen Dale Lukefahr and Thomas James
Davison, a/k/a Thomas Lukefahr, Defendants-Appellants.
 Nos. 78-5244, 78-5279.
 United States Court of Appeals,
Fifth Circuit.
 May 24, 1979.
 
 Ken Davis, James P. Judkins, Tallahassee, Fla., for defendant-appellant in No. 78-5244.
 Nicholas P. Geeker, U. S. Atty., Pensacola, Fla., Donald S. Modesitt, Asst. U. S. Atty., Tallahassee, Fla., for plaintiff-appellee.
 Edwin Marger, Diane E. Marger, Atlanta, Ga., for defendant-appellant in No. 78-5279.
 Appeals from the United States District Court for the Northern District of Florida.
 Before GEWIN, HILL and FAY, Circuit Judges.
 GEWIN, Circuit Judge:
 
 
 1
 David Capo and brothers David Lukefahr, Stephen Lukefahr and Thomas Lukefahr were tried with four other defendants by a jury on one count of conspiracy to possess marijuana and one count of possession of marijuana in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841(a)(1). The jury convicted appellants but their four codefendants were acquitted. Capo was sentenced to 4 years imprisonment, 2 years parole and a $10,000 fine on the conspiracy count and 3 years imprisonment for possession, the sentences to be served consecutively. The Lukefahrs each received consecutive 5 year sentences and $15,000 fines on each count. On this appeal, appellants claim they were denied a fair trial by virtue of prejudicial pre-trial publicity, prejudicial publicity during the trial and prosecutorial misconduct. After giving careful attention to each of these contentions, we believe appellants were afforded due process and accordingly affirm.
 
 
 2
 This case arose from a drug smuggling conspiracy which culminated tragically in the brutal gangland-type murders of four people. In 1976 a government informer, Bobby Joe Vines, planned a drug smuggling operation with a large number of men, including appellants.[1] The conspirators decided to load a large shrimp boat with marijuana and import it into the United States by landing and unloading the boat at the Sandy Creek area near Panama City, Florida.
 
 
 3
 On Sunday night, January 23, 1977, the plan was put into effect. The conspirators landed at Sandy Creek a seventy foot shrimp boat laden with tons of marijuana. As they were unloading the vessel, two men and two young women, ages 14 and 16, happened innocently onto the scene. Apparently one of the men recognized some of the smugglers. He was shot and killed and the conspirators then fatally shot his three companions. The bodies were taken to a location in Taylor County, Florida, wired to concrete and dumped into a deep sinkhole. These crimes were termed the "sinkhole murders" by the media.
 
 
 4
 After arrest state murder charges as well as federal charges were filed against appellants. While their trials on the state charges were pending, they were tried in federal court with the four alleged co-conspirators. After appellants were convicted in the instant case, the state charges against them were dropped. According to the briefs two of the four co-defendants who were acquitted of the federal charges were subsequently convicted in state court of first degree murder and sentenced to death.
 
 
 5
 The trial in the instant case began in January 1978 and consumed 28 days, 10 of which were expended on pre-trial voir dire examination of prospective jurors. The voir dire revealed that as a result of media coverage of the smuggling operation and the sinkhole murders, a significant percentage of the prospective jurors, estimated at 90% By appellants, possessed at least minimal knowledge of the murders, evidence of which was obviously inadmissible in the federal trial, and the connection between the slayings and the drug offenses allegedly committed by appellants.[2]
 
 
 6
 Prior to trial counsel for appellants repeatedly moved pursuant to Federal Rules of Criminal Procedure 21(a) for a change of venue on grounds that the prospective jurors were prejudiced by the pre-trial publicity. The district court denied the motion. Appellants exhausted their peremptory challenges and requested additional strikes, asserting the same grounds. The trial judge refused to grant this request. Appellants' counsel also challenged both the entire venire and individual veniremen for cause on grounds of their knowledge of the prejudicial information. The court granted ten individual challenges for cause during voir dire but denied the others. At the conclusion of the voir dire, a jury of 12 was selected. Each juror had some slight knowledge of the sinkhole murders but each also had repeatedly pledged his or her impartiality during the voir dire examination.
 
 
 7
 Appellants present three primary arguments for this court's review. First, they assert that the prejudicial pretrial publicity required the trial judge to grant their motions for change of venue or alternatively, the challenges for cause or requests for additional peremptory strikes. It is appellants' contention that these procedural safeguards were necessary to protect their rights to a fair trial against the prejudice arising from exposure of an alleged 90% Of the venire and all of the jurors to local media coverage linking the sinkhole murders to appellants' alleged offenses.
 
 
 8
 Claims founded on prejudicial pretrial publicity must be assessed in accordance with the due process standards established in Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The Supreme Court in that decision held that the Constitution entitles a criminal defendant not to a trial by a body of jurors ignorant of all facts surrounding the case, but to an impartial jury which will render a verdict based exclusively on the evidence presented in court. 366 U.S. at 722-23, 81 S.Ct. at 1642-1643.
 
 
 9
 It is not required, however, that jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.
 
 
 10
 Id.
 
 
 11
 In determining whether a fair and unbiased jury was empaneled, an appellate court is obligated to make an independent evaluation of the special circumstances involved in the case. United States v. Williams, 568 F.2d 464, 469 (5th Cir. 1978); United States v. Williams, 523 F.2d 1203, 1208 (5th Cir. 1975). It has long been recognized as a general rule that a defendant, in order to establish a deprivation of due process, must show that potential jurors were actually prejudiced by the pretrial publicity. Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); Calley v. Callaway, 519 F.2d 184, 204 (5th Cir. 1975); Gordon v. United States, 438 F.2d 858, 874 (5th Cir. 1971).[3] This burden of proof requires a showing that community prejudice actually invaded the jury box infecting the opinions of the prospective jurors. United States v. Williams, 523 F.2d 1203, 1208 (5th Cir. 1975). However, when the defendant proffers evidence of pervasive community prejudice in the form of highly inflammatory publicity or intensive media coverage, prejudice is presumed and there is no further duty to establish actual bias. Murphy v. Florida, 421 U.S. 794, 798-99, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Sheppard v. Maxwell, 384 U.S. 333, 362, 86 S.Ct. 1507, 16 L.Ed.2d 600; Estes v. Texas, 381 U.S. 532, 542-43, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Pamplin v. Mason, 364 F.2d 1, 4-5 (5th Cir. 1966). As this court stated in Pamplin :
 
 
 12
 Where outside influences affecting the community's climate of opinion as to a defendant are inherently suspect, the resulting probability of unfairness requires suitable procedural safeguards, such as a change of venue, to assure a fair and impartial trial.
 
 
 13
 364 F.2d at 5. The cases in which such presumptive prejudice has been found are those where prejudicial publicity so poisoned the proceedings that it was impossible for the accused to receive a fair trial by an impartial jury. The clearest paradigms of such pervasive publicity were the trials in Estes and Sheppard wherein the press saturated the community with sensationalized accounts of the crime and court proceedings, and was permitted to overrun the courtroom, transforming the trial into an event akin to a three-ring circus.[4]
 
 
 14
 Having reviewed the record and exhibits, we do not believe that appellants were subjected to prejudicial publicity of such a magnitude that it dominated the proceedings and reduced the trial to a mockery of justice. The trial was held at Tallahassee over 100 miles from Sandy Creek, the site of the crimes, and some distance from the sinkholes where the bodies were discovered. It began almost a year after the occurrence of the alleged offenses. By this time, local news coverage of the conspiracy and the murders had subsided substantially. This is evidenced by the fact that at voir dire most of the prospective jurors and many of the jurors had only a vague recollection of the events that had transpired at Sandy Creek.[5] Moreover, most of the prospective jurors could not recall the name of any person who was accused of participating in the offenses. Given these facts, we fail to perceive the degree of pervasive community prejudice which would warrant a presumption of jury prejudice.
 
 
 15
 Appellants also have failed to show any prejudice in fact. Rather, the record discloses that the district court took elaborate measures to ensure that an impartial jury was empaneled.
 
 
 16
 At the commencement of the proceedings, the court conducted a collective voir dire of all prospective jurors, inquiring as to their ability to render an impartial verdict. The veniremen were carefully instructed to decide the case strictly on the evidence presented at trial. The trial judge further admonished them not to discuss the case with anyone, including family members, and not to read any newspaper articles concerning the trial or listen to radio or television accounts of the proceedings.
 
 
 17
 The court then conducted an individual voir dire of each of the 73 prospective jurors In camera in the presence of defense counsel. During the voir dire the trial judge propounded those questions requested by the defense. Each juror was questioned at length concerning the extent of his or her knowledge of the sinkhole murders, the details surrounding the crime, including the victims' ages, and the names of the alleged perpetrators. Each juror was then questioned repeatedly whether he or she had formulated any preconceived notions on the basis of this knowledge and whether he or she was capable of rendering a fair and impartial verdict based on the evidence. Most of the potential jurors who were cognizant of the murder repeatedly professed their impartiality and that they had no fixed impression or opinion as to guilt or innocence. Some ten of the veniremen who appeared to have an opinion were challenged and dismissed for cause.
 
 
 18
 Throughout the arduous 10 day process, the trial judge continually warned the jurors individually and collectively, at the completion of each day, that they were not to discuss the case with anyone or read or listen to any news accounts about the matter. After the completion of voir dire and the striking of a jury, the court repeated these warnings and continued to do so at each recess throughout the 28 day trial.
 
 
 19
 We are satisfied that the procedural safeguards taken by the court produced a fair and disinterested panel of jurors.[6] In reaching this conclusion, we certainly cannot ignore the jury's acquittal of four of the defendants, two of whom, according to the briefs on file, were subsequently convicted of first degree murder. While this end result is not dispositive of the question of jury prejudice, it does support the trial judge's conclusion that the jurors were unbiased. Viewing the circumstances as a whole, this court is convinced that appellants' due process rights were preserved in the selection of the jury.
 
 
 20
 As their second contention, appellants claim that the trial court failed to properly determine the jury's exposure to a prejudicial newspaper article which was published and disseminated during the trial. On the third day of trial, Monday, February 13, 1978, appellants' counsel offered into evidence outside of the jury's presence a newspaper article which had appeared as the headline story in the Saturday, February 11, edition of the Tallahassee Democrat. The article's headline read "Convicts lived it up here while they could" and a subheadline stated, "Witness recounts threat on life, p. 1B." The article related that the Lukefahr brothers had been convicted in Louisiana on marijuana offenses and were serving prison sentences in that state when they were brought to Tallahassee on a prison furlough to stand trial. The essence of the article was that upon the Lukefahrs' arrival in Florida, they were released, by mistake, from the custody of federal marshals and consequently resided for a number of days at plush hotels in the Tallahassee area.
 
 
 21
 Appellants' counsel contended that the article was inherently prejudicial, and requested the court to individually make inquiry of each juror out of the presence of the other jurors to determine if any members had read the article's headlines or content. The prosecutor objected to any further voir dire examination, but the trial judge overruled this objection, stating that he would inquire of the jurors collectively whether any member had "read or heard anything about the case over the weekend." He added that if he received any affirmative responses, he would then conduct an individual inquiry In camera. The jury was brought in and the trial judge reminded the panel of his previous instructions to not to listen, read or talk about the case. The jurors were then asked three separate times whether they had read any headlines or articles over the weekend about the trial or watched any television accounts. Each time the court phrased the question differently. Each time the jurors replied in the negative. The trial judge then proceeded with the trial.
 
 
 22
 According to appellants, this collective inquiry did not suffice. They assert that the federal supervisory standard adopted by a panel of this circuit in United States v. Herring, 568 F.2d 1099 (5th Cir. 1978), requires an individual examination in all cases of publicity occurring during the trial. We disagree. Given the pretrial safeguards instituted by the trial judge to ensure a fair jury and his careful warnings to ignore press accounts delivered at every recess, the collective questioning of the jury was an adequate tool through which to detect prejudice. In addition, in its final instructions to the jury, the court again scrupulously admonished the jurors to "not let sympathy or bias or prejudice influence" them "in any way", and to consider only the evidence presented in court and "not consider, refer to, nor discuss any fact or circumstance except the evidence" admitted at trial. Appellants in our view were fully protected from any possible prejudice.
 
 
 23
 Furthermore, the voir dire fully satisfied the requirements of Herring. In that decision, this court approved a procedure recommended by the American Bar Association for dealing with publicity which occurs during the trial. Under this procedure, when material disseminated during the trial "goes beyond the record" of the trial and "raises serious questions of possible prejudice", the trial court is to inquire of each juror about his or her possible exposure to the material out of the presence of other jurors. 568 F.2d at 1104.
 
 
 24
 Interpreting this standard, the Herring panel held that a trial judge must conduct a two-step threshold inquiry before determining whether this individual examination is warranted. Id. First, the court must decide whether the matter goes beyond the record and is seriously prejudicial in content. This inquiry includes consideration of the harmfulness of the publicity; whether it speculates on guilt or innocence and whether it was disseminated at a critical moment during the trial. Id. Second, the trial judge is to determine the likelihood that the material reached the jury. 568 F.2d at 1105. This inquiry goes to the trial judge's success in insulating the jury, the contents of his instructions and the regularity with which he gave them. Id. If the threshold questions are answered in the affirmative and reveal that the prejudicial information has possibly reached the jury, the court must conduct an individual inquiry. See id.
 
 
 25
 In the instant case, the court in denying the request for an individual examination, relied in effect on a negative answer to the second threshold inquiry of the Herring test. The trial judge reasoned that he had instructed the jury not to read anything about the trial, they had followed these instructions and if they had read the article, a collective inquiry would reveal it.[7] This manifested the court's belief that the material had not been disseminated to the jury, a conviction that was confirmed by the jurors' negative responses to the court's questions. Thus under the Herring Test, the court was not required to proceed further and conduct an individual examination.
 
 
 26
 appellants claim as their final major contention that the prosecutor commented in his closing argument on appellants' failure to testify.[8] The allegedly impermissible remark followed the Assistant U. S. Attorney's discussion of the defendants' failure to cooperate with law enforcement officers and was as follows:
 
 
 27
 Now its a shame that we have to call Bobby Vines in here. That is a shame. But Bobby Vines at least took the stand and told us what happened. These other guys had the opportunity
 
 
 28
 (Supp.R. 11, p. 196).
 
 
 29
 When he said "these other guys had the opportunity" the prosecutor gestured with his hand in the direction of the defendants seated in the courtroom. Defense counsel immediately objected on the ground that the remark constituted a comment on the silence of the accused. The trial judge did not make a ruling. Rather, the prosecutor explained his statement as directed at the defendants' willingness to commit the offenses and their reluctance to assist the government. He then continued his argument.
 
 
 30
 The criterion by which a prosecutorial statement is appraised to determine if it constitutes a comment on the accused's silence at trial is whether it can be inferred that the prosecutor's manifest intention was to comment upon the accused's failure to testify or his comment was of such a character that the jury would naturally understand it to be a comment on the accused's failure to testify. United States v. Ward, 552 F.2d 1080, 1083 (5th Cir. 1977); United States v. White, 444 F.2d 1274, 1278 (5th Cir. 1971).
 
 
 31
 Viewed in its naked form apart from the remainder of the closing argument, the prosecutor's statement, when combined with his gesture, appears perhaps to be a remark on the defendants' failure to take the stand. A reading of the closing argument in its entirety, however, reveals that the statement was merely part of the prosecutor's rebuttal argument that the defendants had the opportunity to cooperate with law enforcement officials after their arrest but declined to do so.
 
 
 32
 Defense counsel devoted a significant portion of their closing arguments to attacking Vines' credibility in his posture as informer and witness for the government. The rhetorical question of why Vines was testifying at trial for the prosecution was repeatedly raised. The defense was entrapment and counsel wished to convince the jury that Vines induced the defendants to join the conspiracy. In his closing statement, the Assistant U. S. Attorney, as a means of showing the defendants' predisposition to commit the crime, attempted to contrast their refusal to assist federal law enforcement officials with Vines' cooperation. The argument leading up to the statement at issue was as follows:
 
 
 33
 Mr. Modesitt: I clearly stated and I will clearly state it again that no one, when they were being enticed in this thing, indicated, hey, look, I don't want to participate. I'm a lawabiding citizen. Everyone readily went into it. No indication that they were going to tell the police or become an informant. Now isn't it interesting, Mr. Mann, representing Chris Goodwin, came in here and he asked you why is Bobby Vines testifying. Well, why didn't Chris Goodwin when he had four big Opportunities a long time ago, you know, back in February and April and all the times that we indicated he was interviewed by as many as five law enforcement officers, why didn't he say okay, you want me to testify, I will tell you everything that happened? No, he lied. He lied everytime. The officers went to him because they could locate him and they thought he was involved. And on three occasions he lies to them.
 
 
 34
 They go to Steve Long because he was involved a long time ago and Steve Long lied to them.
 
 
 35
 And they went to Bill Epperson, because they thought he was involved, and Bill Epperson lied to them.
 
 
 36
 Now its a shame that we have to call Bobby Vines in here. That is a shame. But Bobby Vines at least took the stand and told us what happened. These other guys had the opportunity. (Emphasis added)
 
 
 37
 (Supp.R. 11, pp. 195-96).
 
 
 38
 It is clear that the prosecutor was referring to the overall conduct of the defendants during the investigation, not to their refusal to testify at trial. By his reference to "opportunity" and "opportunities" he meant the defendants' chances to exculpate themselves from the conspiracy by cooperating with federal officials. In sum, we neither believe that the prosecutor intended to comment on defendants' silence At trial nor that the jury construed the remarks to have this meaning.[9]
 
 
 39
 Long and controversial trials made difficult by multiple defendants and substantial community pressures may easily produce, from their sheer complexity alone, errors of constitutional magnitude. Persuaded as we are that no such error occurred in this case and that appellants received a fair trial, we affirm the judgments of conviction.
 
 
 40
 AFFIRMED.
 
 
 
 [1]
 Fifteen alleged conspirators were indicted
 
 
 [2]
 In the three months preceding trial, approximately twenty-one stories concerning the offenses were published in the Tallahassee Democrat, the city's largest newspaper. It was determined at voir dire that six jurors had daily subscriptions to the Democrat and that four members purchased it on a regular basis. Moreover, it was shown that since the occurrence of the offenses, a local television station had run 120 different news reports linking the murders and the drug offenses. During these newscasts, the word "Murder" surrounded by a red patch, symbolizing blood, was flashed on the screen. It was estimated that each newscast reached over 200,000 people
 
 
 [3]
 The Supreme Court in Irvin articulated the requirement thusly:
 (T)he test is 'whether the nature and strength of the opinion formed are such as in law necessarily * * * raise the presumption of partiality. The question thus presented is one of mixed law and fact * * * .' (citation omitted). 'The affirmative of the issue is upon the challenger. Unless he shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside * * * .'
 366 U.S. at 723, 81 S.Ct. at 1643.
 
 
 [4]
 Similarly, in Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), a confession illegally obtained from the defendant by the police was filmed by a local television station and broadcast three times in the community where the crime and the trial occurred. The Court held that the widespread dissemination of this highly damaging material rendered the defendant's trial nothing more than "a hollow formality." 373 U.S. at 726, 83 S.Ct. 1417. No showing of actual jury prejudice was required
 
 
 [5]
 For example, juror Bradwell stated during voir dire that she had read only one or two articles on the sinkhole murders and had not read any recently. Although she drew some connection between the sinkhole murders and the instant case, she could not recall any of the defendants' names (Supp.R. 4, p. 142). Juror Overstreet stated that she thought there was some connection between the instant case and the sinkhole murders but did not remember any details of the murders. (R. 9, p. 73). Juror Cato stated that although she remembered the sinkhole murders, she recalled only that some "young people were involved" and could not remember the names of any of the alleged perpetrators of the crimes. (Supp.R. 4, p. 49, 56). She further said that she did not associate that occurrence with the instant case or with the defendants. (Supp.R. 4, p. 49-50). The only knowledge juror Golden had about the sinkhole murders was that some bodies had been found in a sinkhole. (R. 8, p. 13). He said he knew nothing about the smuggling operation (R. 8, p. 32). Nor did the name Sandy Creek mean anything to him. (R. 8, p. 13). These and the other jurors stated emphatically that their limited knowledge of the murders would not affect their deliberations and final verdict
 
 
 [6]
 Appellants argue for the adoption of §§ 3, 4(b), ABA Standards for Fair Trial and Free Press as a supervisory power standard to guide federal courts in dealing with prejudicial pre-trial publicity. This recommended rule reads as follows:
 A prospective juror who has been exposed to and remembers reports of highly significant information, such as the existence or contents of a confession or other incriminating matters, or substantial amounts of inflammatory material, shall be subject to challenge for cause without regard to his testimony as to his state of mind.
 We note initially that at least one circuit has refused to invoke its supervisory powers to adopt a pre-trial publicity standard. United States v. Haldeman, 181 U.S.App.D.C. 254, 559 F.2d 31, 62-63 (1976). We likewise are hesitant to do so in this case where the trial court took appropriate measures, including a vigorous voir dire and repeated instructions, to minimize jury exposure to publicity and ferret out any possible prejudice. Moreover, the ABA criterion, which could be interpreted to disqualify jurors for minimal exposure to prejudicial matter, conflicts with longstanding federal policy embodied in Fed.Rules Crim.Proc. 21(a). That rule states that a change of venue is to be granted for prejudicial pretrial publicity if "there exists in the district where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial . . . in that district." This court questions whether a supervisory standard based on minimal exposure is essential to preserving an accused's right under Irvin to an impartial jury.
 
 
 [7]
 Defense counsel Marger and the district judge engaged in the following colloquy:
 Mr. Marger: . . . Obviously, your honor, in regard to this jury, they have shown when asked the question You have advised them not to read any article they have shown some strong hesitancy in indicating that they had. And I believe the response at this time will be identical. In light of your admonition, very few, if any, will admit that they have read it. But an individual voir dire
 The court: Let me say this to you, Mr. Marger. I have far more confidence in our jurors than that. They have been candid and honest with the Court during the individual voir dire. They were instructed not to read, listen to, or hear anything about it, scrupulously, to a man and a woman, to follow those instructions. Now what they had read previously brings up another subject, so I intend to inquire of them individually I mean as a group to find out what kind of response we have got.
 (R. 16, pp. 9-10).
 
 
 [8]
 Also challenged are other statements made by the prosecutor, particularly comments made in his opening statement concerning the Lukefahrs' marijuana offenses in Louisiana. The prosecutor gave notice before trial that he intended to introduce evidence of this criminal behavior to show motive, plan, intent, and identity, as permitted by Fed.Rules of Evidence 404(b). Prior to trial, defendants filed a motion in limine to exclude this evidence. Thereafter, the trial judge's law clerk verbally informed both parties that all pretrial motions were denied. Thus, the prosecutor made his argument with the good faith belief that the evidence was admissible. No reversible error was committed. The allegations as to other statements made at trial by the prosecutor are equally without merit
 
 
 [9]
 In addition, appellant Capo claims his conviction was founded on insufficient evidence. Measured by the principles established in Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1941), the evidence adduced against him amply supported a guilty verdict