**Dennis Edward WILLIAMS,**
**Petitioner-Appellant,**

v.

**Frank GRISWALD, Warden, and Attorney General of the State of Alabama,**
**Respondents-Appellees.**

No. 83–7153.

United States Court of Appeals,
Eleventh Circuit.

Oct. 11, 1984.

Dennis Edward Williams, pro se.

Barry Friedman c/o Davis, Polk & Warwell, Washington, D.C., for petitioner-appellant.

William A. North, Rivard Melson, Asst. Attys. Gen., Montgomery, Ala., for respondents-appellees.

Before HILL and HENDERSON, Circuit Judges, and WISDOM *, Senior Circuit Judge.

ALBERT J. HENDERSON, Circuit Judge:

Dennis Edward Williams was convicted in the Circuit Court of Colbert County, Alabama, for the offense of murder and sentenced to thirty years imprisonment. After exhausting his state remedies, he filed this petition for a writ of habeas corpus pursuant to the provisions of 28 U.S.C. § 2254 in the United States District Court for the Northern District of Alabama. After the denial of the writ by the district court, he lodged this appeal alleging that 1) five jurors read prejudicial statements in a newspaper during the trial, 2) one of the state's witnesses committed perjury at the trial, 3) he did not knowingly and intelligently waive his right to have the jury sequestered at the trial, and 4) he was denied effective assistance of counsel because his attorney failed to adequately apprise him of the nature and consequences of his jury sequestration waiver.

* Honorable John Minor Wisdom, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

The facts pertinent to the issues in this case arose out of a confrontation between Williams and Robert Washington, the deceased, during a party at a friend's house. At some point both pulled guns and shot at each other. Washington was mortally wounded.

At the trial, Williams purported to waive in writing his right to jury sequestration. He entered a plea of not guilty to murder and introduced evidence that he had acted in self defense. The testimony was conflicting on the crucial issues of which of the participants reached for his gun and who fired the first shot.

Before the start of the second day of trial, Williams' attorney moved for a mistrial on the ground that the day before a local newspaper had published an article about the trial containing statements prejudicial to the defendant. The article falsely stated that felony warrants had been issued against Williams in California and Ohio.[1] A poll of the jury revealed that five jurors had read the article. Each of the five jurors assured the court that they would disregard the newspaper article and could render a fair and impartial verdict. Thereupon, the trial judge gave the following cautionary instruction:

I want to instruct to you that anything that you read in the paper is not evidence and I do know for a fact that they had mistaken information because they said N. Pride Tompkins was trying the case and I am trying the case. So, I don't know where they get their information from, but I know it was wrong and I ask that you disregard this—it's not evidence

in this case and it should not be considered by you as such in this case and you are to completely disregard it from your deliberations when you go in to deliberate this case . . . .

Transcript Exhibit vol. 1, pp. 170–71. The judge denied the motion for a mistrial. Williams was subsequently convicted of murder and sentenced to a term in prison.

After an unsuccessful direct appeal, Williams filed a *pro se* petition for a writ of error coram nobis in the Alabama state trial court. He alleged newly discovered evidence, and, in support thereof, attached the affidavit of one of the state's witnesses at the trial, James Tompkins. The affiant stated that he had given false testimony during the trial because of intimidation from the police. There was evidence that an outstanding forgery charge against Tompkins was dropped after Williams' conviction and that the police had originally considered charging Tompkins with Washington's murder.

Without granting an evidentiary hearing, the Alabama state trial court dismissed the coram nobis petition. The Alabama Court of Criminal Appeals affirmed without opinion and the Alabama Supreme Court denied certiorari. The petitioner then filed this *pro se* federal habeas corpus petition in the United States District Court for the Northern District of Alabama. The district court dismissed the petition without an evidentiary hearing.

Before us, Williams claims that it was error for the district court not to conduct an evidentiary hearing on the issues raised

---

1. The complete article read as follows:
   **Murder Trial Opens Today**
   A man believed to be from Cleveland, Ohio, went on trial today facing a murder charge for the February slaying of a Sheffield man.
   Dennis Williams, 30, has been charged with the shooting death of Robert Washington, 40, 907 E. 21st St.
   Washington's body was found Feb. 2 behind a hedge in the front yard of a residence at 700 S. Atlanta Ave. He apparently died from a bullet wound to the chest.
   Washington's car, with bullet holes in the tires and windshield, had been found a few

hours earlier at an address on South Nashville by Sheffield officers responding to a call that someone had shot into a car.
   Williams, who had been in Sheffield several weeks before the shooting, was arrested later in the month in Alcorn County, Miss. According to Alcorn County officials, felony warrants have been issued against Williams in Los Angeles, Calif., and Cleveland.
   The case is being tried in Colbert County Circuit Judge Pride Tompkins' courtroom and is expected to continue for several days.
Transcript Exhibit, vol. 2, p. 383.

in his petition.[2] The burden is on a petitioner in a habeas corpus proceeding to establish the need for such a hearing. *Birt v. Montgomery*, 725 F.2d 587, 591 (11th Cir.1984) (en banc). The threshold inquiry in making that determination is whether the petitioner's allegations, if proved, would establish the right to habeas corpus relief. *Townsend v. Sain*, 372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770, 782 (1963); *Birt*, 725 F.2d at 591 (quoting *Townsend*). In evaluating a request for a hearing a court must "consider the allegations of the defendant's habeas petition and supplement the petition with those facts undisputed on the record below." *Birt*, 725 F.2d at 591; *see Cronnon v. Alabama*, 587 F.2d 246, 249 (5th Cir.), *cert. denied*, 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 792 (1979).[3] Accordingly, we must first examine the allegations in the habeas corpus petition and the undisputed facts in the record before us in an effort to ascertain whether each issue states a constitutional violation.

### I. Publicity During the Trial.

■ It is well established that prejudicial publicity may deprive a criminal defendant of the constitutional right to a fair trial. *See, e.g., Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *United States v. Williams*, 568 F.2d 464 (5th Cir.1978).[4] The cases dealing with prejudicial publicity are divided into three categories: pretrial publicity, *see, e.g., Coleman v. Zant*, 708 F.2d 541 (11th Cir.1983); *Calley v. Callaway*, 519 F.2d 184 (5th Cir.1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1505, 47

L.Ed.2d 760 (1976), publicity during the trial, *see, e.g., United States v. Goodman*, 605 F.2d 870 (5th Cir.1979); *United States v. Williams*, 568 F.2d 464 (5th Cir.1978), and the "media circus" involving publicity both before and during trial. *See, e.g., Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965).

■ Two standards guide our consideration of whether publicity rises to the level of a constitutional violation: "actual jury prejudice" and "presumed prejudice." *See, e.g., Coleman*, 708 F.2d at 544–45. The presumed prejudice criterion has been applied in two types of cases. First, prejudice is presumed under certain circumstances in federal criminal convictions. *See, e.g., Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); *United States v. Williams*, 568 F.2d 464 (5th Cir.1978). In these instances, the presumption is based solely on the supervisory power of the federal courts to formulate standards for the enforcement of the federal criminal law. *Marshall*, 360 U.S. at 313, 79 S.Ct. at 1173, 3 L.Ed.2d at 1252; *Williams*, 568 F.2d at 469. As a result, the presumption is inapplicable to cases involving state convictions. *Murphy v. Florida*, 421 U.S. 794, 797–99, 95 S.Ct. 2031, 2035–36, 44 L.Ed.2d 589, 593–94 (1975).

■ Second, prejudice may be presumed in certain egregious pretrial and "media circus" situations regardless of whether the conviction was obtained in federal or state court.[5] *See, e.g., Sheppard v. Max-*

---

**2.** Alternatively, he requests that this court grant the writ of habeas corpus and order a new trial on the publicity issue.

**3.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

**4.** Although *Williams* involved a direct appeal from a federal conviction rather than a collateral habeas attack, an issue before the court was the defendant's federal constitutional right to a fair trial.

**5.** The Fifth Circuit Court of Appeals has articulated the test as follows: "where a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community, '[jury] prejudice is presumed and there is no further duty to establish bias.'" *Mayola v. Alabama*, 623 F.2d 992, 997 (5th Cir. 1980) (quoting *United States v. Capo*, 595 F.2d 1086, 1090 (5th Cir.1979), *cert. denied*, 444 U.S. 1012, 100 S.Ct. 660, 62 L.Ed.2d 641 (1980)), *cert. denied*, 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981).

*well,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) ("media circus"); *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (pretrial publicity); *Coleman v. Zant,* 708 F.2d 541 (11th Cir.1983) (pretrial publicity).

■ This appeal involves only a state conviction and during-trial publicity. It lacks the inflammatory, widespread publicity characteristic of cases in which prejudice is presumed. This circuit has never enunciated a "presumed prejudice" standard in such a case.[6] Consequently, we reject Williams' assertion that a "presumed prejudice" standard is appropriate[7] and apply the traditional "actual jury prejudice" test.

It has been pointed out that publicity during the trial

> contains greater opportunities for prejudice. For example, information reported during the trial seems far more likely to remain in the mind of a juror exposed to it, and he may be more inclined to seek out this information when he is personally involved in the case.

*Williams,* 568 F.2d at 468. Therefore, the traditional standard is stricter for during-trial publicity cases. *Baldwin v. Blackburn,* 653 F.2d 942, 948 (5th Cir. Unit A 1981), *cert. denied,* 456 U.S. 950, 102 S.Ct. 2021, 72 L.Ed.2d 475 (1982); *Williams,* 568 F.2d at 468. It is important, then, that principles from the pretrial publicity and

"media circus" cases "not be haphazardly applied to cases involving only publicity that occurred during the trial." *Williams,* 568 F.2d at 468; *see Baldwin,* 653 F.2d at 948.

■ Having established what we perceive to be the correct standard, we turn to whether Williams' allegations, if proved, would establish a constitutional violation. The Supreme Court of the United States has instructed that each publicity case "must turn on its [own] special facts." *Marshall,* 360 U.S. at 312, 79 S.Ct. at 1173, 3 L.Ed.2d at 1252. In making this analysis several factors must be considered by the court. *Goodman,* 605 F.2d at 882.

First, we look to the character or nature of the published information. The newspaper article in issue was written objectively and contained no inflammatory or editorial material. *See Patton v. Yount,* 467 U.S. ——, ——, 104 S.Ct. 2885, 2889, 81 L.Ed.2d 847, 855 (1984);[8] *Goodman,* 605 F.2d at 882; *United States v. Herring,* 568 F.2d 1099, 1103 (5th Cir.1978). It was not "patently obvious that the news media and not the jury finally passed judgment on the defendant's guilt." *Id.*

Second, the article was not read by the jurors at a "critical time" during the trial. The story was published between the first and second days of proceedings when the

---

**6.** We note the decision of the Court of Appeals for the Sixth Circuit in *Goins v. McKeen,* 605 F.2d 947 (6th Cir.1979). Like the case before this court, *Goins* involved publicity during the trial and a state conviction. Nonetheless, the *Goins* court upheld the district court's application of the "presumed prejudice" standard set forth in *Marshall v. United States,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), stating that although *Marshall* was inapposite because it was predicated on the supervisory power of the federal courts, the district court "simply relied on the wrong authority to reach the right result." *Goins,* 605 F.2d at 951 n. 8. The court did not then cite supporting authority or state its reasons for extending the doctrine of "presumed prejudice." In light of this omission, we decline to broaden the law of this circuit by adopting *Goins* in this case.

**7.** In support of this contention, *Williams* cites concurring and dissenting opinions in *Smith v.*

*Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). The majority in *Smith,* however, declined to use the urged "implied bias" test. Moreover, the alleged due process violation in *Smith* was that a juror had applied for employment with the district attorney's office. Because the case did not pertain to publicity, even if the majority had adopted the "implied bias" test, its applicability to the present case would be questionable.

**8.** We are not confined to cases dealing with during-trial publicity and state convictions in gleaning the various factors necessary to a decision. In all cases the inquiry is the same—whether the publicity prevented the jury from reaching an unbiased verdict. This is not to say, however, that the ultimate weight accorded the factors and the final conclusions regarding their sufficiency to establish a constitutional violation may properly be applied among all cases.

state was still presenting its case. As the *Goodman* court made clear, such a time is not "critical." *Goodman,* 605 F.2d at 882. This is not a case in which the article was published just before the defendant took the stand,[9] *see Herring,* 568 F.2d at 1103, just prior to closing argument, *see United States v. Concepcion Cueto,* 515 F.2d 160, 164 (1st Cir.1975), or during deliberations, *see United States v. Thomas,* 463 F.2d 1061, 1065 (7th Cir.1972), all of which have been found to constitute "critical times."

The credibility of the source to which the information is attributable may influence the validity of the claim. *See Goodman,* 605 F.2d at 882; *Gordon v. United States,* 438 F.2d 858, 873 (5th Cir.), *cert. denied,* 404 U.S. 828, 92 S.Ct. 139, 30 L.Ed.2d 56 (1971). The credibility of the newspaper article here was seriously strained when the trial judge pointed out a factual error in the article[10] and told the jury that she did "not know where they got their information" and that the article "was wrong." Transcript Exhibit, vol. 1, pp. 170–71. When the trial judge points out a factual error and informs the jury that the information in the publication is largely incorrect, such lack of trustworthiness should be accorded substantial weight.

Another circumstance indicating the lack of jury prejudice is the limited extent of the publicity. *See, e.g., Goodman,* 605 F.2d at 882–83; *Herring,* 568 F.2d at 1103. The

entire story was composed of only eight sentences and appeared once on an inside page of a local newspaper. An allegedly prejudicial publication can hardly be less pervasive.[11] *Cf. Goodman,* 605 F.2d at 883 (in considering degree of pervasiveness court noted article was only 3 × 5½ inches and printed on inside page); *Herring,* 568 F.2d at 1103 (only single instance of publicity cited as factor).

All the jurors who had read the article gave individual assurances in response to the judge's voir dire that they would disregard the article and could render a fair verdict. Although such assurances are not controlling, *Williams,* 568 F.2d at 471,[12] voir dire "has long been recognized as an effective method of rooting out ... bias ...." *Patton,* 467 U.S. at ——, 104 S.Ct. at 2892, 81 L.Ed.2d at 858 n. 13 (quoting *In re Application of National Broadcasting Co.,* 653 F.2d 609, 617 (D.C.Cir.1981)); *see Calley,* 519 F.2d at 208–09 & n. 45.[13]

As a final matter, we note that the trial judge, after learning that the jury had been exposed to publicity, specifically instructed the jury to disregard the newspaper story. Standard admonitions to a jury merely to disregard everything not heard in court may be insufficient to obviate any problems caused by publicity occurring during the trial. *Williams,* 568 F.2d at 471; *accord Goins v. McKeen,* 605 F.2d 947, 953 (6th Cir.1979). The *Williams* court ob-

---

9. The petitioner did not testify at the trial.

10. The article incorrectly identified the trial judge. *See supra* n. 1.

11. We recognize that there are at least two relevant aspects of "pervasiveness." The first is the probability that a juror has been exposed to the publicity and the second is the extent of the exposure. Only the latter consideration is important to this case because the number of jurors who read the article is undisputed.

12. "[C]ontinual protestations of impartiality from prospective jurors are best met with a healthy skepticism from the bench." *United States v. Williams,* 523 F.2d 1203, 1209 n. 10 (5th Cir.1975). In addition, it "is for the court, not the jurors themselves, to determine whether their impartiality has been destroyed by any prejudicial publicity they have been exposed to." *United States v. Hyde,* 448 F.2d 815, 848 n. 38

(5th Cir.1971), *cert. denied,* 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972).

13. A finding of no bias based solely on the jurors' assurances would not suffice. In *Goins v. McKeen,* 605 F.2d 947 (6th Cir.1979), in affirming the district court's grant of habeas corpus relief, the court noted that the trial judge appeared "to have based his findings of impartiality exclusively upon the jurors' assurances to the court ...." *Id.* at 953. The transcript in *Goins* reveals that the trial judge stated in response to argument from counsel that "I'm going to have to rely on the integrity of the jurors." *Id.* at 950 n. 4. Unlike *Goins,* the trial court here did not rely exclusively on the jurors' disclaimer of prejudice, but pointed out the incorrectness of the article and specifically instructed them to disregard the newspaper story.

served that "[n]o specific instruction was given to the [jury] to disregard the news report ..., nor were they instructed that the [report was] not evidence of guilt." *Williams*, 568 F.2d at 466. In the present case, however, the trial judge's instruction was specific. The judge cautioned the jury that what they had read was not evidence, that they should not consider it, and that it was incorrect. Transcript Exhibit, vol. 1, pp. 170–71. *Cf. Smith v. United States*, 385 F.2d 34, 39–40 (5th Cir.1967) (prejudice resulting from news stories published during trial remedied by instruction when publicity not highly probative of guilt).

There is no doubt that the trial court could have provided additional measures to insure the impartiality of the jury verdict. For instance, she failed to admonish the jurors at the beginning of the trial to disregard or avoid newspaper accounts of the trial, she questioned each of the five jurors who had read the article in the presence of the entire jury panel,[14] *see Irvin v. Dowd*, 366 U.S. 717, 728, 81 S.Ct. 1639, 1645, 6 L.Ed.2d 751, 759 (1961); *Goins*, 605 F.2d at 953, and did not determine whether the jurors exposed to the article had discussed it with the others. *See id.* Also, consideration must be given to the fact that the statement strongly implied that Williams had committed prior crimes. *Cf. Marshall*, 360 U.S. at 310–13, 79 S.Ct. at 1172–73, 3

L.Ed.2d at 1251–52 (article alleging two previous felony convictions). *See generally Williams*, 568 F.2d at 470–71 (citing degree to which publicity is probative of guilt). Similarly, the statement would probably have been inadmissible given the facts at issue in the case.[15] *See id.* at 470. Furthermore, after the trial judge had specially instructed the jury to disregard the newspaper article, the prosecutor twice asked Williams' wife if she had ever been to Ohio or California, the two states in which the warrants were supposedly outstanding. Transcript Exhibit, vol. 2, pp. 263, 267.[16]

■ Viewing all these factors in hindsight, we are mindful of the general principle that it is not necessary that the jurors be totally ignorant of the facts and issues involved in the case. *Irvin*, 366 U.S. at 722–23, 81 S.Ct. at 1642–43, 6 L.Ed.2d at 756. The ultimate test is whether "the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*, 366 U.S. at 723, 81 S.Ct. at 1643, 6 L.Ed.2d at 756.

■ We therefore conclude that the totality of the specific circumstances in this case compels the finding that there were not sufficient facts alleged to establish a constitutional violation.[17] Consequently,

14. There are at least two consequences of questioning a juror about possible bias in front of the rest of the jury. First, the juror may be reluctant to admit any bias in front of his peers. *Irvin v. Dowd*, 366 U.S. 717, 728, 81 S.Ct. 1639, 1645, 6 L.Ed.2d 751, 759 (1961). Second, as the petitioner points out, group questioning serves to apprise otherwise ignorant jurors of the offensive publicity.

15. Because the statement about the felony warrants was false, no witness could possess the requisite personal knowledge to testify competently. *See Bradford v. Harris*, 34 Ala.App. 15, 37 So.2d 675 (unobtained, unobservable evidence goes to competency of witness), *aff'd*, 251 Ala. 386, 37 So.2d 677 (1949). Moreover, evidence of prior bad acts of a criminal defendant not resulting in a conviction are generally inadmissible to prove the facts at issue in his trial. *See Deloach v. State*, 356 So.2d 222, 230 (Ala. Crim.App.) (arrest has no bearing on guilt of accused), *cert. denied*, 356 So.2d 230 (Ala.1978);

*Rogers v. State*, 54 Ala.App. 13, 304 So.2d 255 (1974) (accusation inadmissible to impeach).

However, the "inadmissibility of the news report's contents is only one factor to be considered, and the crucial issue is the degree and pervasiveness of the prejudicial influence." *United States v. Williams*, 568 F.2d 464, 470 (5th Cir.1978).

16. This consideration highlights the analogy between this situation and the one in which a witness inadvertently or otherwise makes an inadmissible statement. In such cases a curative instruction by the trial judge to the jury to disregard the statement is usually considered sufficient to eliminate any possibility of juror prejudice. *See, e.g., United States v. Hammons*, 489 F.2d 701 (5th Cir.1974) (per curiam).

17. The deference to be accorded the findings of the state trial judge concerning the prejudice to the jury resulting from publicity is not clear. In *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6

Williams has not met his burden of proving the need for an evidentiary hearing.[18]

## II. Alleged Use of Perjured Testimony.

█ The "existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." *Townsend v. Sain,* 372 U.S. 293, 317, 83 S.Ct. 745, 759, 9 L.Ed.2d 770, 788 (1963). It is clear, however, that the knowing use of material false evidence by the state in a criminal prosecution does violate due process. *Giglio v. United States,* 405 U.S. 150, 153, 92 S.Ct. 763, 766, 31 L.Ed.2d 104, 108 (1972); *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217, 1221 (1959); *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 341–42, 79 L.Ed. 791, 794 (1935); *Skipper v. Wainwright,* 598 F.2d 425, 427 (5th Cir.) (per curiam), *cert. denied,* 444 U.S. 974, 100 S.Ct. 469, 62

L.Ed.2d 389 (1979). This rule applies equally when the state, although not soliciting perjured testimony, allows it to go uncorrected after learning of its falsity. *Giglio,* 405 U.S. at 153, 92 S.Ct. at 766, 31 L.Ed.2d at 108; *Napue,* 360 U.S. at 269, 79 S.Ct. at 1177, 3 L.Ed.2d at 1221. In addition, "[i]t is of no consequence that the falsehood [bears] upon the witness' credibility rather than directly upon [the] defendant's guilt." *Napue,* 360 U.S. at 269, 79 S.Ct. at 1177, 3 L.Ed.2d at 1221 (quoting *People v. Savvides,* 1 N.Y.2d 554, 557, 136 N.E.2d 853, 854, 154 N.Y.S.2d 885, 887 (1956)); *see Giglio,* 405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 108.

In this case, James Tompkins testified for the state at the trial that he had seen Williams first draw and fire his weapon.[19] He also stated that he was testifying without pressure from any source.[20] In sup-

L.Ed.2d 751 (1961), the Supreme Court characterized the standard of review in a habeas corpus action of a state court's findings concerning the partiality of the jury as "manifest error." *Id.,* 366 U.S. at 723–24, 81 S.Ct. at 1643, 6 L.Ed.2d at 756.

Recently, however, the Supreme Court in *Patton v. Yount,* 467 U.S. ——, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), distinguished a state court's finding that an individual juror was impartial notwithstanding his exposure to publicity from a finding that the jury as a whole was impartial. The *Patton* Court held that the former was a question of fact and was, therefore, entitled to deference in a federal habeas corpus proceeding under 28 U.S.C. § 2254(d). The Court appears to have deferred a decision on the effect of publicity on the impartiality of the jury as a whole. *See Patton,* 467 U.S. at ——, 104 S.Ct. at 2889, 81 L.Ed.2d at 854 n. 7, 857. *Cf. Rushen v. Spain,* —— U.S. ——, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (per curiam) (state court determination that jury deliberations as a whole were not biased by ex parte communications of a single juror a question of fact entitled to deference under section 2254). We need not determine whether the state court finding in the case before us concerned the jury as a whole or individual jurors, and whether state court findings concerning only during-trial publicity enjoy the statutory standard of deference because we conclude that the alleged facts do not establish a constitutional claim even under a de novo review of the state court's finding.

**18.** Because the only adverse consequence of the jury separation was the exposure to publicity, our holding that the exposure did not infringe

the Constitution necessarily disposes of Williams' jury sequestration waiver and ineffective assistance of counsel claims. Accordingly, we need not further address either of these two issues.

**19.** Transcript Exhibit, vol. 1, pp. 114–15.

**20.** Tompkins testified on cross-examination as follows:

Q. Are you under any pressure here today?
A. Well, yeah, I mean just attensive [sic], you know. That put me in a pressure.
Q. And has anybody been putting any pressure on you?
A. No.
Q. What?
A. No.
. . . .
Q. I'm going to ask you James, are you under pressure from some other people?
A. No.
. . . .
Q. James, at one time weren't you told that they were going to charge you with murder of Bobby Washington?
A. Yeah.
Q. What?
A. Yeah, I had heard it.
Q. Did that effect you in any way as to your statement here today?
A. I don't think so.
Q. What?
A. I can't really say, but I don't think it did.
*Id.* at 119–21. On redirect by the state the testimony continued:
Q. And no police officer threatened with charging you if you didn't make a statement did they?

port of his petition for a writ of habeas corpus, Williams submitted the affidavit of Tompkins to the effect that except for police intimidation, he would have testified that Washington, the victim, drew his gun first, after which Tompkins turned and ran from the scene.[21]

The petition, accompanying affidavit and the facts in the record suggest two possible *Giglio* violations: 1) the state knowingly left uncorrected Tompkins' false trial testimony that he was under no pressure from anyone to testify, and 2) the state consciously permitted Tompkins to testify that Williams fired the first shot.[22] Our first consideration is whether the petition and affidavit coupled with the undisputed facts in the record sufficiently allege these constitutional violations to warrant an evidentiary hearing, the threshold test of *Townsend.*

■ In order to satisfy the mandate of *Giglio,* the petition must point to specific facts establishing that the testimony was 1) used by the state, 2) false, 3) known by the state to be false, and 4) material to the guilt or innocence of the defendant. *See generally Giglio,* 405 U.S. at 153–54, 92 S.Ct. at 766, 31 L.Ed.2d at 108–09; *Napue,* 360 U.S. at 269–72, 79 S.Ct. at 1177–78, 3 L.Ed.2d at 1221–23. It is undisputed that

there is a sufficient allegation that Tompkins' testimony was used by the state and was false.

The next inquiry is whether the state authorities knew of the alleged falsity of Tompkins' testimony. If Williams cannot demonstrate specific facts that, if proven, would establish the state's knowledge then there is no necessity for an evidentiary hearing. *See, e.g., Raulerson v. Wainwright,* 732 F.2d 803, 813 (11th Cir.1984); *United States v. Auten,* 632 F.2d 478, 480 (5th Cir. Unit A 1980); *United States v. Jones,* 614 F.2d 80, 82 (5th Cir.), *cert. denied,* 446 U.S. 945, 100 S.Ct. 2174, 64 L.Ed.2d 801 (1980). It is of no consequence that the facts pointed to may support only knowledge of the police because such knowledge will be imputed to state prosecutors. *Schneider v. Estelle,* 552 F.2d 593, 595 (5th Cir.1977); *Smith v. Florida,* 410 F.2d 1349, 1351 (5th Cir.1969).

■ It is well established that the standards governing the sufficiency of habeas corpus petitions are less stringent when the petition is drafted *pro se* and without the aid of counsel. *See Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam). Hence, not only are the allegations of such petitions to be construed more liberally, *see Haggard v. Ala-*

---

A. No.
*Id.* at 124.

**21.** The affidavit states in relevant part:
> I saw Bobby Washington pull a pistol from his back pocket or from his belt then I got scared and started to run, I didn't see anyone fire a gun, I only heard the shots.
> I perjured myself at the trial of Dennis Williams because of intimidations made by the police, I was under pressure by the cases had on me.

Record at 36.

**22.** The facts alleged also suggest a disregard of the principles in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Brady* proscribes the knowing failure to disclose to the defendant material information "favorable to the accused." There is little doubt that Tompkins' version of the events as stated in his affidavit concerning both the shooting incident and whether he was coerced to testify would have been favorable to the appellant. The remaining elements necessary to establish the *Brady* violations mirror those concerning the *Giglio* infrac-

tions: whether the state knew of the information and whether it was material. Although the test for determining state knowledge is the same for *Giglio* and *Brady* violations, the *Brady* materiality standard is more difficult to meet in a case such as this in which there is no evidence of a specific *Brady* request. *See United States v. Agurs,* 427 U.S. 97, 112–13, 96 S.Ct. 2392, 2401–02, 49 L.Ed.2d 342, 354–55 (1976) (whether information would actually create reasonable doubt as to guilt in the mind of the judge); *United States v. Walker,* 720 F.2d 1527, 1535 n. 5 (11th Cir.1983) (when information relevant only to credibility of witness, standard becomes whether disclosure of the information would probably result in an acquittal) (citing *Garrison v. Maggio,* 540 F.2d 1271 (5th Cir.1976), *cert. denied,* 431 U.S. 940, 97 S.Ct. 2655, 53 L.Ed.2d 258 (1977)), *cert. denied,* —— U.S. ——, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984). As a result, it is not necessary in this case to address the possible *Brady* violations because a *Giglio* criterion will suffice for our purposes.

*bama,* 494 F.2d 1187, 1189 (5th Cir.1974), but unincluded allegations of "apparent" facts may be treated as part of the complaint for the purpose of determining whether an 'issue should be remanded for further investigation. *See Dickson v. Wainwright,* 683 F.2d 348, 351–52 (11th Cir.1982).[23]

■ Applying this more liberal standard, we hold that there are sufficient facts alleged to infer the state's knowledge of the falsity of both Tompkins' trial testimony that he had not been intimidated and his testimony describing the shooting incident. As for the former, the inartfully drawn affidavit does not make clear whether Tompkins felt pressure merely because of the existence of possible charges against him or because of intimations by the police that the charges would either be brought or dropped depending on his testimony. Only the latter sort of coercion could support a constitutional claim. In any case, the omitted allegation that the police bargained with the charges to induce Tompkins' favorable testimony is sufficiently implied to justify a remand under our precedent.

There is a similar ambiguity regarding the sufficiency of the allegation that the state knew of Tompkins' fabricated story. The only facts alleged are that he changed his testimony because of police intimidation. Tompkins' affidavit does not make

clear whether the intimidation was for the purpose of influencing a version of the homicide favorable to the state's theory, or merely for some other reason, such as inducing Tompkins to testify at all. Only the former sort of persuasion could support a constitutional claim that the state knowingly used Tompkins' perjured testimony. We reason that the missing allegation that the purpose of the alleged intimidation was to change testimony known by the state to be detrimental to the proof of its case is apparent from the other assertions. Consequently, there is a sufficient allegation that the state was aware that Tompkins falsely testified about the shooting.[24]

■ The final element of a *Giglio* violation is the materiality of the alleged perjured testimony. The standard for materiality is whether the false testimony "could ... in any reasonable likelihood have affected the judgment of the jury." *Giglio,* 405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 108 (quoting *Napue,* 360 U.S. at 271, 79 S.Ct. at 1178, 3 L.Ed.2d at 1222); *see United States v. Antone,* 603 F.2d 566, 570 (5th Cir.1979).

Four eyewitnesses to the shooting testified on the crucial issue of self-defense. Mary Louise Williams testified for the state that she saw the appellant's hand move upwards and then saw the fire "coming along side of him." Transcript Exhibit,

23. In *Dickson v. Wainwright,* 683 F.2d 348 (11th Cir.1982), the petitioner, acting *pro se,* sought a writ of habeas corpus on the ground of ineffective assistance of trial counsel. His petition alleged that he informed his attorney of witnesses who could aid his defense, that his attorney had not interviewed all of them, and that as a result, certain witnesses did not appear at trial on his behalf. The petition, however, failed to identify the potential witnesses or state the substance of their testimony.

Nonetheless, this court held that the allegations, along with an affidavit from trial counsel stating that he had in fact interviewed or investigated all potential witnesses whose names were furnished by the defendant, raised "at least an *apparent* factual dispute regarding the effectiveness of counsel's pretrial preparation." *Id.* at 352 (emphasis in original). The court then remanded the case for further investigation on the ineffective assistance of counsel issue.

The court did not mandate an evidentiary hearing. Rather, the court chose not to "foreclose any avenue by which the district judge might further investigate this issue on remand," such as "propounding ... interrogatories to the petitioner." *Id.* The court observed, however, that an evidentiary hearing may be required if the inquiry revealed that the petitioner could point to specific incidents of ineffectiveness. *Id.*

*Dickson* technically does not relax the standard for an evidentiary hearing, but instead establishes an intermediate basis for an appellate court to remand for further investigation. This further investigation may disclose facts requiring a full evidentiary hearing.

24. We express no opinion whether an evidentiary hearing on either issue would be necessary if the petition had been drawn by an attorney.

vol. 1, p. 81. She stated that she never saw a gun in Washington's hand. *Id.* at 80. James Tompkins' testimony on behalf of the state was substantially similar. *Id.* at 114–15, 118.

James L. Johnson and Rosylind Williams were called as eyewitnesses for the defense. Johnson stated that both Washington and the appellant had a gun, Transcript Exhibit, vol. 2, p. 220, that both guns were fired at nearly the same time, *id.* at 221, and that he "believe[d]" that Washington shot first. *Id.* Rosylind Williams recounted that Washington fired the first shot. *Id.* at 258.

If Tompkins' present explanation of the relevant events was available at the trial, there would have been some reasonable likelihood that the judgment of the jury would be affected. Tompkins would have become the third eyewitness to state that Washington was the aggressor, thus enforcing to some degree Williams' claim of self-defense. Moreover, this turn of events would have left uncorroborated the testimony of Mary Louise Williams. We acknowledge that there was additional evidence in support of the state's case and that the evidence of the eyewitnesses is not necessarily determinative of Williams' plea of self-defense. Nor are we in a position to make any judgment as to the credibility of the defense witnesses. We only hold that had the evidence been as Tompkins asserts in his affidavit, it would satisfy the materiality factor in *Giglio.*

■■■ Williams has met his burden of meeting the threshold *Townsend* test. Once this test is satisfied, a "federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances: ... (5) the material facts were not adequately developed at the state court hearing ...." *Townsend,* 372 U.S. at 313, 83 S.Ct. at 757, 9 L.Ed.2d at 786. *See also,* 28 U.S.C. § 2254(d)(3) (codifying same standard). "There cannot even be the semblance of a full and fair hearing unless the state court actually reached and decided the issues of fact tendered by the defendant." *Townsend,* 372 U.S. at 313–14, 83

S.Ct. at 757, 9 L.Ed.2d at 786. Unfortunately, Williams was not afforded a hearing in state or federal court on his *Giglio* claims.

Under these circumstances, we must remand the case to the district court for an evidentiary hearing on the crucial issues of 1) whether the state knowingly left uncorrected Tompkins' trial testimony that he was under no pressure to testify and 2) whether the state knowingly used false testimony concerning the shooting affray.

The judgment of the district court dismissing the habeas corpus petition is VACATED and the case REMANDED for proceedings consistent with this opinion.