**Frank WILKINSON, Petitioner,**

v.

**UNITED STATES of America,
Respondent.**

**Civ. A. No. 1:89–CV–0365–JOF.**

United States District Court,
N.D. Georgia,
Atlanta Division.

July 1, 1991.

George Brian Spears, Ralph S. Goldberg, Atlanta, Ga., Paul L. Hoffman, ACLU Foundation of Southern California, Mark Chais, Michael D. Stein, Douglas E. Mirell, Loeb & Loeb, Los Angeles, Cal., for petitioner.

Daniel A. Caldwell, III, Asst. U.S. Atty., Atlanta, Ga., for respondent.

## ORDER

FORRESTER, District Judge.

This matter is before the court on defendant United States of America's motion to dismiss Frank Wilkinson's petition for writ of error coram nobis. Petitioner asks the court to vacate his January 22, 1959 conviction for contempt of Congress.

## I. FACTS

In the spring of 1958, the House of Representatives Committee on Un–American Activities authorized subcommittee hearings to be held in Atlanta, Georgia to investigate "the extent, character and objects of Communist colonization and infiltration in the textile and other basic industries located in the South, and Communist Party propaganda activities in the South...." One week prior to the hearings, petitioner came to Atlanta and registered at a hotel indicating his business firm association as the "Emergency Civil Liberties Committee." Upon learning this information, the subcommittee subpoenaed petitioner to appear and give testimony at the hearings. *See Wilkinson v. United States*, 365 U.S. 399, 405 n. 5, 81 S.Ct. 567, 571 n. 5, 5 L.Ed.2d 633 (1961). After being sworn and stating his name, petitioner refused to answer any questions of the committee.

When petitioner refused to answer the question, "Are you now a member of the Communist Party?" Richard Arens, Staff Director of the Committee on Un–American Activities of the House of Representatives, explained to petitioner that the question was relevant to the subcommittee's purpose for holding the hearings in Atlanta because "[i]n order to know about Communist activities and Communist techniques, we have got to know who the Communists are and what they are doing." Arens informed petitioner that,

it is the information of this committee that you are now a hard core member of the Communist Party; that you are designated by the Communist Party for the purpose of creating and manipulating certain organizations, including the Emergency Civil Liberties Committee, the affiliate organizations of the Emergency Civil Liberties Committee, including a particular committee in California and a particular committee in Chicago, a committee—the name of which is along the line of the Committee for Cultural Freedom, or something of that kind. ...
It is the information of the committee or the suggestion of the committee that in anticipation of the hearings here in Atlanta, Georgia, you were sent to this area by the Communist Party for the purpose of developing a hostile sentiment to this committee and to its work for the purposes of undertaking to bring pressure upon the United States Congress to preclude these particular hearings. Indeed, it is the fact that you were not even subpoenaed for these particular hearings

until we learned that you were in town for that very purpose and that you were not subpoenaed to appear before this committee until you had actually registered in the hotel here in Atlanta.

The subcommittee chairman then directed Wilkinson to answer the question concerning membership in the Communist Party. Petitioner responded, "I challenge in the most fundamental sense, the legality of the House Committee on Un–American Activities." Petitioner stated his belief that it was beyond the power of Congress to establish the committee because the committee "tends, by its mandate and by its practices, to investigate precisely those areas of free speech, religion, peaceful association and assembly, and the press, wherein it cannot legislate and therefore cannot investigate."

Arens then read a portion of testimony given by Anita Edith Bell Schneider at a hearing held in California wherein she stated that she knew Wilkinson was a member of the Communist Party. Petitioner refused to answer a question concerning the truthfulness of this testimony. Petitioner also refused to answer the question "Are you now the principal driving force, the leader of the Emergency Civil Liberties Committee?" Petitioner was subsequently indicted for violating 2 USC § 192 by refusing to answer the question, "Are you now a member of the Communist Party?" *Id.*, at 407, 81 S.Ct. at 572.[1]

Richard Arens was the primary government witness at petitioner's trial. Arens testified that the committee possessed information that Wilkinson was a member of the Communist Party. This information included the identification of Wilkinson as a party member by a "creditable witness" who appeared before the committee within a year or so prior to the Atlanta hearings. Arens claimed that the committee knew that the "Communist hierarchy" had given Wilkinson the task of infiltrating the South through the work of the Emergency Civil

Liberties Committee [ECLC], a group identified as a communist organization by the Senate Internal Security Subcommittee. Arens stated that the House Committee knew Wilkinson had been engaged in Communist work for the ECLC in Atlanta and elsewhere in the South, but did not know that Wilkinson was coming to Atlanta to try and prevent the subcommittee hearings until he registered at an Atlanta hotel. Arens also testified that Wilkinson was in Atlanta with a Dr. James A. Dombrowski, a leader of the Southern Conference Education Fund, which the Internal Security Subcommittee of the Senate had also found to be a communist organization.

At the close of the evidence, Wilkinson moved for a judgment of acquittal on grounds that the evidence clearly showed that the sole purpose for subpoenaing him was to harass him in retaliation for his efforts to prevent the subcommittee from conducting the hearings in Atlanta.[2] Wilkinson also argued that his fundamental position was that the mandate of the House Committee was "defective because it is an encroachment upon [sic] violation of the first amendment." Transcript, p. 48. The motion was denied. After closing arguments the judge instructed the jury,

> You are not concerned with whether the committee had a right to ask the questions or why it asked them. You are not concerned with whether this defendant was or was not a communist or subversive or what his answer might have been, and you are not concerned that his failure to answer may even have been upon the advice of counsel or his lawyer. ...
> You are not to consider the validity of the objection made by the defendant to answering the question concerned in this indictment or whether the claimed invalidity of the committee, lack of jurisdiction of the committee or lack of pertinency of the question because these are matters for my decision, and I have decided

---

1. Petitioner was not charged with contempt for his refusal to answer the question concerning membership in the ECLC.

2. Wilkinson's motion for acquittal was made out of the jury's hearing. The trial judge denied the motion immediately, without requiring a response from the government. Transcript, p. 48.

as a matter of law that the committee was properly authorized by Congress, that the questions were pertinent to the subject matter under investigation, and that the objections he made and the reasons he gave do not justify refusal to answer these questions. ... I have determined as a matter of law that the committee had the right to ask this question and the defendant had the duty to answer this question under the conditions that I will explain later.

Transcript, p. 57.

The issues presented to the jury were 1) whether the offense was committed in the Northern District of Georgia; 2) whether a quorum of a validly constituted subcommittee was present on the date of the alleged offense; 3) whether defendant appeared before the subcommittee; 4) whether defendant was asked the question set forth in the indictment; 5) that defendant willfully refused to answer the question after having been directed to do so; and 6) that the subject matter under inquiry and the pertinency of the question to that subject matter would have been clear to an average person in the defendant's position. *See* Transcript, at p. 60. Defendant did not object to the charge.

Defendant appealed his conviction to the Fifth Circuit on grounds that the statute and resolution establishing the House subcommittee were unconstitutional and that the committee's questioning of defendant and subsequent prosecution were undertaken to harass and expose defendant. Relying on the Supreme Court's decision in *Barenblatt v. United States,* 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959), the Fifth Circuit affirmed petitioner's conviction. In *Barenblatt,* the Supreme Court held, "Congress has wide power to legislate in the field of Communist activity in this country and to conduct appropriate investigations in aid thereof...." 360 U.S. at 127, 79 S.Ct. at 1093. The Court found that "the constitutional legislative power of Congress in this instance is beyond question." *Id.,* at 133, 79 S.Ct. at 1097. The Court rejected Barenblatt's contention that the House committee's investigation of Communist infiltration in the area of edu-

cation was not in furtherance of the legislative purpose but with the true objective being purely "exposure." *Id.,* at 132, 79 S.Ct. at 1096.

In *Barenblatt,* the Court recognized that there was no congressional power to "expose for the sake of exposure." Nonetheless, the court had no authority to intervene on the basis of the motives of Congress or congressional committee members so long as Congress or the committee was acting in pursuance of a constitutional legislative purpose. *Id.,* at 132–33, 79 S.Ct. at 1096–97; *Arizona v. California,* 283 U.S. 423, 455, 51 S.Ct. 522, 526, 75 L.Ed. 1154 (1931). The Court reiterated its holding in *Watkins v. United States,* 354 U.S. 178, 200, 77 S.Ct. 1173, 1186, 1 L.Ed.2d 1273 (1957), that the committee members' "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served." The Court's opinion in *Barenblatt* concluded with the observation that,

[t]here is no indication in this record that the Subcommittee was attempting to pillory witnesses. Nor did petitioner's appearance as a witness follow from indiscriminate dragnet procedures, lacking in probable cause for belief that he possessed information which might be helpful to the Subcommittee. And the relevancy of the questions put to him by the Subcommittee is not open to doubt.

360 U.S. at 134, 79 S.Ct. at 1097.

Petitioner Wilkinson appealed to the United States Supreme Court on grounds that the Fifth Circuit had misinterpreted the Court's reasoning in *Barenblatt.* The Supreme Court held that "we can find nothing to indicate that it was the intent of Congress to immunize from interrogation all those (and there are many) who are opposed to the existence of the Un–American Activities Committee. Nor can we say on this record that the subcommittee was not pursuing a valid legislative purpose." *Wilkinson v. United States,* 365 U.S. at 399, 81 S.Ct. at 567. The Court rejected Wilkinson's argument that, even if the hearing generally may have been pursuant

to a valid legislative purpose, the sole reason for choosing to interrogate Wilkinson was to expose him to public censure because he was an active opponent of the committee. *Id.*, at 411, 81 S.Ct. at 574. The Court stated that,

> [i]t was therefore entirely logical for the subcommittee to subpoena the petitioner after he had arrived at the site of the hearings, had registered as a member of a group which the subcommittee believed to be communist dominated, and had conducted a public campaign against the subcommittee.... Moreover, it is not for us to speculate as to the motivations that may have prompted the decision of the individual members of the subcommittee to summon the petitioner.

*Id.*, at 411-12, 81 S.Ct. at 574-75.

Most importantly, the Court found that Wilkinson was not summoned to appear "as the result of an indiscriminate dragnet procedure, lacking in probable cause for belief that he possessed information which might be helpful to the subcommittee." *Id.*, at 412, 81 S.Ct. at 575. In so finding, the Court relied on Staff Director Arens' testimony at trial that the committee had reason to believe that petitioner was an active Communist leader. In a footnote, the Court reproduced the following portion of Arens' trial testimony:

> In essence the information of which the committee was possessed was that Mr. Wilkinson was a member of the Communist Party, that he had been identified by a creditable witness under oath before the committee a short time or within a year or so prior to the Atlanta hearings, identified as a communist. It was also the information of the committee that Mr. Wilkinson had been designated by the communist hierarchy in the nation to spearhead or to lead the infiltration into the South of a group known as the Emergency Civil Liberties Committee which itself had been cited by the Internal Security Subcommittee as a communist operation or a communist front. It was the information of the committee that Mr. Wilkinson's assignments, including setting up rallies and meetings over the country for the purpose of engendering sentiment against the Federal Bureau of Investigation, against the security program of the government, and against the Committee on Un–American Activities and its activities.

*Id.*, at 412-13, n. 9, 81 S.Ct. at 574-75, n. 9.

The Court rejected petitioner's attempt to differentiate his case from *Barenblatt* on grounds that he was being punished for publicly criticizing the committee and attempting to create public pressure on Congress to abolish the committee. The Court concluded:

> We cannot say that, simply because the petitioner at the moment may have been engaged in lawful conduct, his communist activities in connection therewith could not be investigated. The subcommittee had reasonable ground to suppose that petitioner was an active Communist Party member, and that as such he possessed information which would substantially aid it in its legislative investigation.

*Id.*, at 414, 81 S.Ct. at 576.

## II. ALLEGATIONS OF THE COMPLAINT

The complaint alleges that an internal Federal Bureau of Investigation memorandum dated November 21, 1961 shows that the Justice Department was aware that the "creditable witness" who identified petitioner as a member of the Communist Party had on one occasion exhibited emotional instability and that the FBI had broken off contact with her. The memo states,

> The following information regarding WILKINSON's CP membership comes from sources not considered advisable to use as government witnesses:
> ANITA EDITH BELL SCHNEIDER, ... testified at a public session of the House Committee on Un–American Activities (HCUA) as a friendly witness on 12/7/56 at Los Angeles. She testified that she had been a CP member from the spring of 1951 to January, 1955, and during the course of her membership furnished information to the FBI. She testified that FRANK WILKINSON was one of the persons she knew who had been a member of the CP sometime during the period

of the spring of 1951 to January, 1955. . . .

The Bureau, by letter dated 11/7/61, to Los Angeles on another matter, instructed that in view of the background of ANITA EDITH BELL SCHNEIDER it is not believed advisable to make her identity available to the Department of Defense in connection with that matter. San Diego, by letter dated 10/17/61 to the Bureau, stated that SCHNEIDER testified before the Subversive Activities Control Board in March, 1955, at which time she exhibited emotional instability and that since 1955, pursuant to the Bureau instructions, no further contact has been had with SCHNEIDER and her present whereabouts are unknown to the San Diego office.

*See* Exhibit A to the Complaint.

Petitioner claims that the government suppressed this evidence, which would have been favorable to him, and offered perjured testimony that Schneider was a reliable informant. Upon discovering the existence of the FBI memo, petitioner filed the petition for writ of error coram nobis and sought discovery to determine whether staff director Arens had given false testimony concerning the other grounds for the subcommittee's belief that petitioner was involved in communist activities.

## III. WRIT OF ERROR CORAM NOBIS

■ Federal courts have the authority to issue writs in the nature of coram nobis under the All Writs Act, now codified as 28 U.S.C. § 1651(a). *United States v. Morgan*, 346 U.S. 502, 511, 74 S.Ct. 247, 252, 98 L.Ed. 248 (1954); *Moody v. United States*, 874 F.2d 1575, 1576 (11th Cir.1989). The writ is a limited and extraordinary remedy providing a right of review "only under circumstances compelling such action to achieve justice." *Morgan*, 346 U.S. at 507–11, 74 S.Ct. at 250–53 (cited in *Moody*, 874 F.2d at 1576); *Rener v. United States*, 475 F.2d 125, 126 (5th Cir.1973) (writ should be allowed only to "remedy manifest injustice").

■ The error alleged in a petition must involve "a matter of fact of the most fundamental character which has not been put in issue or passed upon and which renders the proceeding itself irregular and invalid." *Moody*, 874 F.2d at 1577, citing *United States v. Mayer*, 235 U.S. 55, 69, 35 S.Ct. 16, 19–20, 59 L.Ed. 129 (1914) and *Morgan*, 346 U.S. at 512, 74 S.Ct. at 253. Thus, Wilkinson may not use the writ to re-litigate issues unaffected by the new evidence, such as whether the House Committee and Subcommittee had constitutional authority to conduct their investigation, or whether the questions put to petitioner were pertinent to that investigation.

### A. *Newly Discovered Evidence*

■ In *Mayer v. United States*, the Supreme Court noted that the writ of coram nobis was "available to bring before the court that pronounced the judgment errors in matters of fact which had not been put in issue or passed upon and were material to the validity and regularity of the legal proceeding itself ..." 235 U.S. at 68, 35 S.Ct. at 19. In *Moody v. United States*, the Eleventh Circuit made it clear that writ of error coram nobis may not be issued on the basis of newly discovered evidence that is "only potentially relevant to a factual issue decided long ago by a jury for, if it were, the limitations of [Federal Rule of Criminal Procedure 33] would be meaningless and the writ would no longer be extraordinary." *Moody*, 874 F.2d at 1577. In a footnote the court stated: "We also hold that the evidence brought forth by Moody is not so compelling that, had it been presented to the jury, Moody likely would have been acquitted." *Id.*, at 1577 n. 4.

Petitioner levels his attack at the committee hearings, but the sentence he seeks to vacate is based on his conviction for contempt of Congress. Unlike the new evidence in *Moody*, the FBI memorandum would not have been presented to the jury because it does not go to the elements of the offense of which Wilkinson was convicted. Instead, it goes to the rulings by the trial judge to some extent and to the rationale for the denial of the appeal to a greater extent. The principal issues for

the trial judge were committee jurisdiction and pertinency of the question. It seems doubtful that these rulings would have been affected by learning that the FBI source was emotionally unstable. The most important inquiry is whether this revelation that the FBI became disaffected with its informant would have caused the United States Supreme Court to hold that the prosecution of Wilkinson was an invalid proceeding because petitioner was summoned as part of a "dragnet" in violation of *Barenblatt.*

It is clear that the Supreme Court relied on more than Mr. Arens' testimony that Schneider was a creditable witness when it found that the subcommittee was acting within its legislative purpose in summoning petitioner. Petitioner argues that Arens' alleged untruthfulness concerning Schneider cast suspicion on all of his testimony concerning the committee's evidence of petitioner's participation in communist activities. Petitioner contends that the petition should not be dismissed before plaintiff has an opportunity to engage in discovery that might lead to evidence that all of Arens' testimony was false.

However, there is one portion of Arens' testimony which cannot be questioned. Plaintiff had clearly identified himself as a member of the ECLC when he registered at his hotel in Atlanta even though he refused to answer a question concerning his membership in that organization during the subcommittee hearing. It is undisputed that this committee had been identified as a front for communist activity, which corroborates Schneider's information. While the Supreme Court noted Schneider's testimony, it also emphasized petitioner's activities in registering at the hotel as a member of the ECLC.

Given the broad investigative powers of the committee as recognized in *Barenblatt* and *Wilkinson*, the court is of the opinion that petitioner's membership in this orga-

nization alone was sufficient grounds for a reasonable belief by the subcommittee that petitioner had information relevant to the subcommittee's authorized areas of inquiry. Consequently, petitioner's prosecution for refusal to answer questions at the hearing was not rendered irregular or invalid by Arens' alleged perjury. The allegedly perjured testimony was not considered or even heard by the jury. Thus, the court need not reach the issue of whether petitioner is required to show that the alleged perjury and suppression of evidence would have resulted in a different verdict. Even if petitioner's allegations were proven true, he would not be entitled to issuance of the writ.

### B. *Suppression of Evidence and Prosecutorial Misconduct*

Wilkinson alleges that the government suppressed the evidence he has recently discovered and that the government allowed one of its witnesses to commit perjury.[3] Petitioner argues that such prosecutorial misconduct infected the proceeding against him in its entirety, regardless of whether presentation of the evidence would have resulted in a different outcome. Petitioner further argues that the alleged misconduct constitutes a fundamental miscarriage of justice because its effect was to impinge on petitioner's first amendment rights.

In *Morgan v. United States,* the Supreme Court included prosecutorial misconduct and the obtaining of a conviction through perjured testimony in its review of the grounds recognized by the common law as meriting a writ of coram nobis. 346 U.S. at 508–10, 74 S.Ct. at 250–52. Prior to *Morgan,* the Fifth Circuit had recognized that the government solicitation of perjured testimony might support a petition for coram nobis. *See Grene v. United States,* 448 F.2d 720 (5th Cir.1971) (application for writ of error coram nobis was

---

**3.** The FBI memorandum does not clearly show that Arens committed perjury when he said that his source was reliable. From the record it seems most likely that her accusations against Wilkinson were true, and the court notes that Wilkinson does not today say that they are un-

true. The claim is only that Arens knew that the witness was not credible, but the FBI document shows only that she was emotionally unstable and that it was not desirable to use her as a witness.

proper remedy where petitioner claimed that prosecution's witness at trial later confessed to having given perjured testimony); *Garrison v. United States*, 154 F.2d 106, 107 (5th Cir.1946).[4]

Petitioner relies on *Hirabayashi v. United States of America*, where the Ninth Circuit held that, where the Supreme Court's decision would probably have been profoundly and materially affected if the court had been advised of the suppression of evidence concerning the real reason for the government's issuance of exclusion orders concerning persons of Japanese ancestry during World War II, suppression of the evidence was sufficient grounds for issuance of a writ of coram nobis. 828 F.2d 591 (9th Cir.1987). That case is inapposite because the court has concluded that the new evidence would not have affected the trial court or Supreme Court's determination that the subcommittee had reasonable grounds for believing that Wilkinson possessed information relevant to the committee's investigation. Petitioner's membership in the ECLC was sufficient grounds for the issuance of a subpoena. It follows that the Supreme Court's disposition of Wilkinson's first amendment argument would be unaffected by the alleged misconduct. Therefore, petitioner's argument that the alleged misconduct impinged on his first amendment rights need not be considered.

■ It is true that a conviction should be invalidated and a new trial granted when a prosecutor knowingly uses false testimony and there is *any reasonable likelihood* that the false testimony could have affected the judgment of a jury. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 271, 79 S.Ct. 1173, 1178, 3 L.Ed.2d 1217 (1959); *Brown v. Wain-*

*wright*, 785 F.2d 1457, 1464 (11th Cir.1986) (district court erred in requiring habeas corpus petitioner to demonstrate that correction of false testimony "probably would have resulted in an acquittal"). This standard applies to impeaching as well as exculpatory evidence. *Brown*, 785 F.2d at 1464 (applying *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985)).[5] In *James v. United States*, 175 F.2d 769 (5th Cir.1949), the court held that petitioner's allegation that the United States Attorney and an FBI agent had knowingly and falsely procured and used perjured testimony would, if proven, entitled petitioner to relief under 28 U.S.C. § 2255. However, the court did not address the issue of materiality.

■ In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that suppression of evidence favorable to an accused, if requested by defendant, violates the defendant's due process rights if the evidence was material either to guilt or punishment. Arens had previously advised Wilkinson of Schneider's identification of him. Petitioner Wilkinson has not alleged that he requested any exculpatory evidence from the government, or that he requested evidence concerning the credibility of the witness who identified him as a Communist Party member. Thus, even if *Brady* were given retroactive application, it would not entitle petitioner to relief.

The Court's holding in *Brady* rested on its previous holding in *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), which predated Wilkinson's trial. In *Mooney* the Court held that a habeas corpus petitioner would be entitled to relief if he proved his allegation that the government knowingly used perjured testimony

**4.** Subsequent to *Morgan*, the Fifth Circuit has consistently held that the use of perjured testimony does not rise to the level of a constitutional error unless the prosecution *knowingly* used the testimony to obtain a conviction. *Braxton v. Estelle*, 641 F.2d 392, 395 (5th Cir.1981); *Skipper v. Wainwright*, 598 F.2d 425, 427 (5th Cir. 1979) (per curiam); *see also Mooney v. Holohan*, 294 U.S. 103, 110, 55 S.Ct. 340, 341, 79 L.Ed. 791 (1935).

**5.** In *United States v. Scherer*, petitioner claimed that newly discovered evidence produced in a later related civil action showed that the government had used perjured evidence against him at trial. 673 F.2d 176, 177 (7th Cir.1982). That court's holding that new evidence which is merely impeaching is insufficient grounds for a new trial has been discredited by *Bagley*.

and deliberately suppressed evidence favorable to him to procure a conviction. *Id.*, at 112, 55 S.Ct. at 341. The Court held that petitioner's allegations were sufficient to state a claim for deprivation of rights guaranteed by the Constitution. *Id.* Because the Court denied the petition for a writ of habeas corpus for failure to exhaust state remedies, it did not address the issue of materiality. However, the petitioner alleged perjury by the witnesses "upon whose testimony he was convicted ..." *Id.*, at 110–111, 55 S.Ct. at 340–41.

Petitioner also relies on *Napue v. Illinois,* where the Supreme Court stated that,

> it is established that a conviction obtained through the use of false evidence, known to be such by the representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.

360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) (cits. omitted). The Court focused on the possibility that the false evidence might have had an effect on the jury's assessment of a prosecution witness's credibility and, concomitantly, on the outcome of the trial. *Id.*, at 272, 79 S.Ct. at 1178.

As noted above, the new evidence presented by petitioner would only impeach Arens' testimony about the reliability of the informant, not about the identification of Wilkinson as a member of the Communist Party. It has no relevance to the elements of a violation of 2 U.S.C. § 192. The alleged prosecutorial misconduct could not have affected the jury's verdict unless it so impeached the credibility of Arens that the jury would not have believed that Wilkinson had refused to answer the question put to him. Wilkinson never argued or produced evidence that the elements of a § 192 violation had not been established. Thus, even if petitioner's allegations are true, they do not show that his conviction was procured through false testimony or the suppression of evidence.

The government's motion to dismiss the application for writ of error coram nobis is GRANTED.

SO ORDERED.